## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| MARY KETNER, individually and on behalf of all others similarly situated<br><br>        Plaintiff,<br><br> v.<br><br>STATE EMPLOYEES CREDIT UNION OF MARYLAND, INC.<br><br>and<br><br>DOES 1 through 10<br><br>        Defendants. | **Civil No.:  1:15-CV-03594-CCB** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

## TABLE OF CONTENTS

I.    SUMMARY ..................................................................................................................1

II.   THE HISTORY OF THIS CASE ................................................................................2

III.  TERMS OF THE SETTLEMENT ..............................................................................3

    1.    Class Definition ..............................................................................................3

    2.    Monetary Payment ..........................................................................................4

    3.    Payments to Claimants....................................................................................4

    4.    *Cy Pres* Distribution ......................................................................................4

    5.    Class Notice ....................................................................................................5

    6.    Opt Out Procedure ..........................................................................................6

    7.    Opportunity to Object .....................................................................................6

    8.    Attorneys' Fees and Expenses ........................................................................6

    9.    Release ............................................................................................................6

IV.   ARGUMENT ...............................................................................................................7

    A.    The Settlement Should Be Preliminarily Approved ...........................................7

        1.    Class Action Settlement Procedure..........................................................7

        2.    The Standard for Granting Preliminary Approval. This Proposed
             Settlement is Reasonable, Fair and Adequate Given the Strength of the
             Case and the Risks of Litigation ............................................................8

        3.    The Proposed Attorneys' Fees and Class Representative Service Award
             are Reasonable .......................................................................................12

        4.    The Proposed Forms of Notice and Notice Programs are Appropriate
             and Should Be Approved .......................................................................13

    B.    The Proposed Settlement Class Should Be Certified.........................................14

        1.    The Requirement of Numerosity is Satisfied.........................................14

        2.    The Requirement of Commonality is Satisfied......................................15

3.    The Requirement of Typicality is Satisfied ...........................................16

4.    The Requirement of Adequate Representation is Satisfied ...................16

5.    Ascertainability is Satisfied ..................................................................18

6.    The Proposed Settlement Class Meets the Requirements of Rule 23(b)(3) ...............................................................................................18

      a.    Common Questions of Law and Fact Predominate ...................18

      b.    This Class Action is the Superior Method of Adjudication........20

C.    SCHEDULE OF SETTLEMENT DATES .......................................................21

V.    Conclusion ...................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods. Inc. v. Windsor*
   521 U.S. 591 (1997)..........................................................................................14, 17, 18

*Amos v. Board of Directors of Milwaukee*
   408 F. Supp. 765 (E.D. Wis. 1976)..............................................................................17

*Armstrong v. Bd. of School Directors*
   616 F.2d 305 (7th Cir. 1980) ........................................................................................8

*Brunson v. La.-Pac. Corp.*
   818 F. Supp. 2d 922 (D.S.C. 2011)................................................................................9

*Carnegie v. Household Int'l, Inc.*
   376 F.3d 656 (7th Cir. 2004) ......................................................................................20

*Central Wesleyan College v. W.R. Grace & Co.*
   143 F.R.D. 628 (D.S.C. 1992) ......................................................................................15

*Chisolm v. TranSouth Fin. Corp.*
   184 F.R.D. 556 (E.D. Va. 1999) ..................................................................................15

*City of Detroit v. Grinnell Corp.*
   356 F. Supp. 1380 (S.D.N.Y. 1972)..............................................................................11

*DeWitt v. Darlington Cty.*
   Civil Action No. 4:11-cv-00740-RBH, 2013 U.S. Dist. LEXIS 172624 (D.S.C. Dec. 6,
   2013) ............................................................................................................................12

*Eisen v. Carlisle & Jacquelin*
   417 U.S. 156, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974)................................................16

*EQT Prod. Co. v. Adair*
   764 F.3d 347 (4th Cir. 2014) ......................................................................................18

*Feliciano v. Romney*
   363 F. Supp. 656 (S.D.N.Y. 1973) ..............................................................................17

*Fisher v. Va. Elec. & Power Co.*
   217 F.R.D. 201 (E.D. Va. 2003) ..................................................................................20

*Flinn v. FMC Corp.*
   528 F.2d 1169 (4th Cir. 1975) ................................................................................8, 10

*Gonzales v. Cassidy*
    474 F.2d 67 (5th Cir. 1973) ............................................................................17

*Grice v. PNC Mortg. Corp. of Am.*
    Civil Action No. PJM-97-3084, 1998 U.S. Dist. LEXIS 23875
    (D. Md. Apr. 30, 1998) ....................................................................................13

*Gunnells v. Healthplan Servs.*
    348 F.3d 417 (4th Cir. 2003) ..........................................................................18

*Helmick v. Columbia Gas Transmission*
    No. 2:07-cv-00743, 2010 U.S. Dist. LEXIS 65808 (S.D. W. Va. July 1, 2010) ............13

*Hoffman v. First Student, Inc.*
    2010 U.S. Dist. LEXIS 27329 (D. Md. 2010) ................................................12

*Horton v. Merrill Lynch, Pierce, Fenner & Smith*
    855 F. Supp. 825 (E.D.N.C. 1994)........................................................7, 8, 10

*Ingram v. Coca-Cola Co.*
    200 F.R.D. 685 (N.D. Ga. 2001)......................................................................13

*In re Am. Capital S'holder Derivative Litig.*
    2013 U.S. Dist. LEXIS 90973 (D. Md. 2013) ..................................................8

*In re Corrugated Container Antitrust Litig.*
    643 F.2d 195 (5th Cir. 1981) ............................................................................9

*In re Lupron Mktg. & Sales Litig.*
    345 F. Supp. 2d 135 (D. Mass. 2004) ..............................................................8

*In re Mid-Atlantic Toyota Antitrust Litigation*
    564 F. Supp. 1379 (D. Md. 1983) ................................................................7, 8

*In re Montgomery Cnty. Real Estate Antitrust Litig.*
    83 F.R.D. 305 (D. Md. 1979)............................................................................8

*In re Serzone Prods. Liab. Litig.*
    231 F.R.D. 221 (S.D. W. Va. 2005)................................................................14

*In re Titanium Dioxide Antitrust Litig.*
    No. RDB-10-0318, 2013 U.S. Dist. LEXIS 130288 (D. Md. Sep. 11, 2013) ............8, 10

*In re Toys R US FACTA Litig.*
    295 F.R.D. 438 (C.D. Cal. 2014) ....................................................................11

*James Foster & Stone Logistics, Inc. v. CEVA Freight, LLC*
    272 F.R.D. 171 (W.D. N.C. 2011)....................................................................19

*Klay v. Humana, Inc.*
  382 F.3d 1241 (11th Cir. 2004) .................................................................19

*Manuel v. Wells Fargo Bank, Nat'l Ass'n*
  No. 3:14cv238 (DJN), 2016 U.S. Dist. LEXIS 33708 (E.D. Va. Mar. 15, 2016) ..........13

*Martel v. Valderamma*
  2015 U.S. Dist. LEXIS 49830 (C.D. Cal. 2015).............................................11

*Morris v. Wachovia Sec., Inc.*
  223 F.R.D. 284 (E.D. Va. 2004) .................................................................15

*Mullane v. Cent. Hanover Bank & Tr. Co.*
  339 U.S. 306, 70 S. Ct. 652 (1950).............................................................13

*Murray v. GMAC Mortg. Corp.*
  434 F.3d 948 (7th Cir. 2006) .....................................................................18

*Phillips Petroleum Co. v. Shutts*
  472 U.S. 797 (1985)...........................................................................13, 14

*Reilly v. Tucson Elec. Power Co.*, 512 U.S. 1220, 114 S. Ct. 2707
  129 L. Ed. 2d 834 (1994) ..........................................................................14

*S.C. Nat'l Bank v. Stone*
  749 F. Supp. 1419 (D.S.C. 1990)..................................................................9

*Shaw v. Toshiba Am. Info. Sys., Inc.*
  91 F. Supp. 2d 942 (E.D. Tex. 2000)...........................................................13

*Smilow v. Southwestern Bell Mobile Systems, Inc.*
  323 F.3d 32 (1st Cir. 2003).......................................................................18

*Smith v. B & O R.R. Co.*
  473 F. Supp. 572 (D. Md. 1979)............................................................16, 17

*Stillmock v. Weis Mkts., Inc.*
  385 F. App'x 267 (4th Cir. 2010)...........................................................18, 20

*Torrisi v. Tucson Elec. Power Co.*
  8 F.3d 1370 (9th Cir. 1993) .......................................................................13

*Tyson Foods, Inc. v. Bouaphakeo*
  136 S.Ct. 1036 (2016)...............................................................................19

*Wal-Mart Stores, Inc. v. Dukes*
  131 S. Ct. 2541 (2011)..............................................................................15

*Weinberger v. Kendrick*
    698 F.2d 61 (2d Cir. 1982)..........................................................................................9

*Wells v. Chevy Chase Bank, F.S.B.*
    363 Md. 232, 768 A.2d 620 (2001) ............................................................................19

*Windham v. American Brands, Inc.*
    565 F.2d 59 (4th Cir. 1977) ......................................................................................18

## Statutes and Regulations

12 C.F.R. § 1005.17............................................................................................................1

Fed. R. Civ. P. 23............................................................................................... passim

Fed. R. Civ. P. 30.............................................................................................................9

## Other Authority

7 Wright & Miller § 1779 ...............................................................................................20

7 Wright & Miller § 1766 ...............................................................................................17

Manual for Complex Litigation, Second § 30.44 .........................................................7

Manual for Complex Litigation, Fourth § 21.632.......................................................14

Newberg on Class Actions § 11.41...............................................................................9

Newberg on Class Actions § 1120.................................................................................17

## MEMORANDUM

## I.    SUMMARY.

This is a putative class action alleging that Defendant State Employees Credit Union of Maryland, Inc. ("SECU" or "Defendant") charged overdraft fees based on what it calls the "available balance" in customer accounts (*i.e.*, a subset of the actual account balance from which money has been deducted by placing holds on funds earmarked for pending transactions which have not yet posted) rather than the money actually in the account (sometimes called the "ledger balance"), allegedly in violation of the terms of its contract governing the overdraft program for certain types of transactions.  In this brief, this is referred to as Plaintiff's "sufficient funds" theory.  Plaintiff also alleges that Defendant violated Regulation E, 12 C.F.R. § 1005.17 ("Reg. E"), by enrolling credit union members in its overdraft program for subject transactions without obtaining their affirmative consent to do so based on a complete and valid disclosure of the terms of the program. SECU strongly disputes Plaintiff's contentions.

The parties mediated this matter before Magistrate Judge A. David Copperthite.  The matter did not resolve at the mediation, but Magistrate Judge Copperthite made a mediator's proposal, and gave the parties three weeks to accept it or reject it.  The parties ultimately accepted Judge Copperthite's mediator's proposal, subject to this Honorable Court's approval.  Under the proposed settlement agreement, SECU will pay $1,700,000, with no reversion of any residue to SECU. (*See* Exhibit 1 to the Declaration of Taras Kick ("Kick Decl."), "Settlement Agreement" ["SA"] ¶ 1(r).)  The settlement payment will be used to provide restitution to class members, pay the litigation costs, costs of notice and claims administration, attorney fees in the amount of one-third of the Value of the Settlement (subject to this Court's approval), and a service award to the class representative for her work on behalf of the class.

The manner of distribution of this proposed settlement is very consumer friendly, as it does not require any claims whatsoever to be made by the class members.  Specifically, payment will be credited to the class members according to a formula which divides the net settlement fund by the total improper overdraft charges for the relevant period and multiplies the resulting figure by an individual class member's total improper overdraft charge.  (SA ¶ 7(d)(iv).)  This

settlement compensation will be directly deposited into existing customers' accounts, and will be distributed by check to the last known address of all former members, without the need for any claim to be made by any class member.  (SA, ¶ 7(d)(v).)  Any money that remains after this distribution process, rather than revert to Defendant, instead will go to a 501(c)(3) non-profit, Public Citizen, an organization actively involved in protecting consumer rights (if approved by this Court).  (SA ¶ 11.)

As discussed in more detail below, the dollar amount of the settlement represents approximately 37.17% of the most likely recovery at trial,[1] and every single class member will receive either a direct deposit or check without having to make a claim, and also while avoiding for the class members all of the risks and further costs that would have been incurred had this litigation continued.  (Kick Decl. ¶¶ 11-12.)    In sum, the proposed settlement is fair, and Plaintiff's counsel respectfully requests that the Court preliminarily approve the settlement so that notice of a final approval hearing may be disseminated to the class at this time.

## II.    THE HISTORY OF THIS CASE.

The Complaint in this action was filed on November 24, 2015 (Docket No. 1 "Complaint"), alleging that SECU had breached its contracts with its customers and violated Reg. E by charging overdraft fees for transactions which, to be completed, required less money than was already in the customers' actual balance.  (Complaint, ¶ 1, ¶¶ 22-27.)  Plaintiff filed a First Amended Complaint on May 5, 2016.  (Docket No. 26).  On May 31, 2016, SECU filed a motion to dismiss the First Amended Complaint (Docket No. 33), which Plaintiff opposed on June 17, 2016 (Docket No. 36), and in support of which SECU filed a reply on July 5, 2016. (Docket No. 37).

Regarding discovery, on May 18, 2016, Plaintiff propounded on SECU her first set of requests for production of documents, comprised of 11 categories of documents, to which SECU responded on July 20, 2016 and for which SECU provided supplemental responses on August 1,

---

[1] Further, the percent number is higher when also considering the dollar amount of forgiven overdraft fees that had not been collected yet from class members.

2016.  (Kick Decl. ¶ 5.)  On October 24, 2016, Plaintiff propounded on SECU her second set of requests for production of documents, bringing the total number of requested categories to 100, her first set of special interrogatories, comprised of 25 requests, and her first set of requests for admission, comprised of 25 requests.  (Kick Decl. ¶ 5.)  On February 15, 2017, SECU propounded on Plaintiff its first set of requests for documents, comprised of 11 categories of documents.  (Kick Decl. ¶ 5.)  Plaintiff responded to this discovery on March 22, 2017.  (Kick Decl. ¶ 5.)  On April 26, 2017 Plaintiff took the deposition of Adrienne Allgire, SECU's corporate representative designated as most knowledgeable on subjects related to overdraft fees in Baltimore, Maryland, and on April 13, 2017, SECU took Plaintiff's deposition in Annapolis, Maryland.  (Kick Decl. ¶ 5.)

The settlement negotiations were at all times at arm's length, adversarial and devoid of any collusion.  (Kick Decl. ¶ 6.)  On April 27, 2017, the parties participated in a mediation before the Honorable A. David Copperthite.  Although the matter did not settle on that date, Judge Copperthite made a mediator's proposal and gave the two sides three weeks to accept or reject it.  (Kick Decl. ¶ 6.)  The parties accepted Judge Copperthite's proposal.  As part of the due diligence related to the settlement, Plaintiff's database expert, Arthur Olsen, received access to SECU's database.  (*See* Declaration of Arthur Olsen ("Olsen Decl.") ¶¶ 6-11.)  As a result of his analysis, Mr. Olsen has been able to confirm that SECU charged $4,913,910 in overdraft fees when there was enough money in the account to cover the transaction in question if "holds" on deposits or pending transactions were not taken into account, which is what the Plaintiff's "sufficient funds" theory of the case is, and that after applying credits for reversals, the amount of total damages on the "sufficient funds" theory is $4,573,375.  (Olsen Decl. ¶¶ 8-10.)   The new money settlement amount in this case of $1,700,000 therefore represents approximately 37.17% of the total "sufficient funds" damages that have been identified in this case.

## III.   TERMS OF THE SETTLEMENT.

### 1.   Class Definition.

The class includes any member of SECU who, between November 24, 2012 and September 30, 2016, was assessed an overdraft fee when the member had sufficient money in his

or her ledger balance, but insufficient money in his or her available balance to complete the transaction that caused the fee.  (SA ¶ 1(e).)  The parties already have determined that there are 33,216 members in the class.  (Olsen Decl. ¶¶ 9-10.)

### 2.    Monetary Payment.

Pursuant to the terms of the Settlement, Defendants will pay $1,700,000 into a settlement fund, which will be set up by a third-party administrator and used to pay class members directly. (SA ¶¶ 1(r), 7.)  As the settlement does not require any claims to be made by the class members, they need not take any action to receive payment.  (SA ¶ 7.) The settlement fund will also be used to pay claims and notice administration costs, and to pay for attorney fees and litigation costs as approved by this Court. (SA ¶ 7.)

### 3.    Payments to Claimants.

As stated, no class member will need to make a claim.  (SA ¶ 7.)  The amount paid to each class member shall be calculated as follows: (Net Settlement Fund / Total Improper Overdraft Charges) x Total Improper Overdraft Charge per Class Member = Individual Payment. (SA ¶ 7(d)(iv).)  This means each class member will be treated fairly by receiving a proportionate share of his or her "sufficient fund" overdraft fees refunded as a result of this settlement.

Class members who remain SECU members at the time of the distribution will receive a credit to their checking accounts in the amount of the Individual Payment.  (SA ¶ 7(d)(v)(1).)  If they do not have a checking account, but maintain another account at Defendant, then that account shall be credited.  (*Id*.)  Class Members who are not members of Defendant at the time of the distribution of the Net Settlement Fund shall be sent a check by the claims administrator to the address to which the class notice was sent, discussed *infra*, or at such other address as designated by the Class Member.  (SA ¶ 7(d)(v)(2)).  The Class Member shall have one-hundred eighty days (180) to negotiate the check, after which the payment will re-collect in the residue to be distributed to a *cy pres* recipient.  (*Id*.)

### 4.    *Cy Pres* Distribution.

Under no circumstances will any of the money from this settlement revert to SECU. (SA

¶ 7(e).)  Rather, if there is any residue which remains in the Net Settlement Fund, the settlement provides for a *cy pres* distribution to Public Citizen, a non-profit organization devoted to protecting consumer rights, or to some other non-profit, public benefit corporation nominated by Class Counsel and approved by the Court whose work benefits Maryland consumers.  (SA ¶ 11.)

> **5.    Class Notice.**

The Settlement Agreement provides that, for class members who are current members of SECU and who have agreed to receive notices regarding their accounts from Defendant by email, SECU will provide the claims administrator with the most recent email addresses it has for those class members, to which the claims administrator will email the notice in a manner that is calculated to avoid being caught and excluded by spam filters or other devices intended to block mass email.  (SA ¶ 4(b).)  For any emails that are returned undeliverable, the claims administrator will use the best available databases to obtain current email address information for those members, update its database with those addresses, and resend the notice to them.  (*Id.*)

For those class members who are not currently members of SECU or who did not agree to receive notices regarding their accounts by email, the claims administrator will mail those members the notice by first class United States mail to their best available mailing addresses. (SA ¶ 4(c).)  The claims administrator will run the names and addresses provided by SECU through the National Change of Address Registry and update them as appropriate.  (*Id.*)  If a mailed notice is returned with forwarding address information, the claims administrator shall re-mail the notice to the forwarding address.  (*Id.*)  For all mailed notices that are returned as undeliverable, the claims administrator shall use standard skip tracing devices to obtain forwarding address information and, if the skip tracing yields a different forwarding address, the claims administrator shall re-mail the notice to the address identified in the skip trace, as soon as reasonably practicable after the receipt of the returned mail.  (*Id.*)  Finally, the notice shall also be posted on a settlement website created by the claims administrator.  (SA ¶ 4(d).)

Plaintiff has requested bids for service from Kurtzman Carson Consultants LLC ("KCC") and Garden City Group LLC ("GCG").

///

**6.      Opt Out Procedure.**

Any class member who wishes to opt out can do so by mailing an exclusion letter by the

Bar Date. (SA ¶ 12.)

**7.      Opportunity to Object.**

Under the proposed schedule for approval of this settlement, class members will have the

opportunity to object from the time notice is mailed to them until fifteen days after class counsel

will file the Motion for Final Approval, including for attorneys' fees and reimbursement of costs

and expenses, both with this Honorable Court and also on the website created by the claims

administrator for this settlement.  This means that every class member who so wishes will have

at least 45 days to object since the Motion for Final Approval will not be filed sooner than 30

days after notice of this settlement goes out.  (SA ¶¶ 1(a), 13.)

**8.      Attorneys' Fees and Expenses**

Attorneys' fees and costs are to be paid out of the settlement fund.  Class counsel will

apply to this Court for attorneys' fees of one-third of the Settlement Fund, or $566,666.67, plus

reimbursement of reasonable litigation costs. (SA ¶ 7(d)(i).)[2]  Defendant has agreed not to

oppose this fee request.  (*Id*.)  Class Counsel's litigation costs in this matter are approximately

$21,000 to date, and Class Counsel have committed to the litigation costs in this matter,

including the costs of database expert consultant Arthur Olsen, not to exceed $25,000. (Kick

Decl. ¶ 10.)  Additionally, the firms of McCune Wright Arevalo and The Kick Law Firm, APC,

the two proposed lead counsel in this matter, have agreed to share equally in the attorneys' fees,

and this was disclosed to and approved by the proposed class representative Ms. Ketner.  (*Id*.)

**9.      Release.**

In consideration for the settlement, class members are releasing all claims they made or

could have made which in any way arise out of any allegations concerning the alleged

---

[2] Although the Settlement Agreement allows for an application of fees of up to one-third of the
"value of the settlement," and the "value of the settlement" far exceeds the $1.7 million of new
money because of the non-pursuit of uncollected overdraft fees from class members, Class
Counsel is limiting its application to one-third of the new money of $1.7 million.

wrongdoing during the class period (consistent with the class definition) in the Action. (SA¶ 14.)

## IV.   ARGUMENT

### A.   The Settlement Should Be Preliminarily Approved.

#### 1.   Class Action Settlement Procedure.

Class action settlements are subject to a two-step approval process.  First, the Court makes a preliminary evaluation of the fairness of the settlement.  If the Court determines that the settlement appears be fair, adequate and reasonable, then it should order that notice be given to the class members of a formal final settlement hearing.  (The Federal Manual for Complex Litigation, Second ("MCL 2d"), at § 30.44.)  At that formal hearing, evidence may be presented in support of and in opposition to the settlement. The Federal Manual for Complex Litigation, Second, summarizes the preliminary approval criteria as follows:

> If the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that notice be given to the class members of a formal fairness hearing, at which evidence may be presented in support of and in opposition to the settlement.

(MCL 2d § 30.44.); *see also, Horton v. Merrill Lynch, Pierce, Fenner & Smith*, 855 F. Supp. 825 (E.D.N.C. 1994) (citing *In re Mid-Atlantic Toyota Antitrust Litigation*, 564 F. Supp. 1379 (D. Md. 1983)).

This is consistent with the Rule 23(e) settlement approval procedure, which (after provisional certification of the proposed settlement class [*see* Section IV.B., *infra*.]),  describes a three-step process for approval of a class action settlement:

1) Preliminary approval of the proposed settlement;

2) Dissemination of notice of the settlement to all affected class members; and

3)  A formal fairness hearing, *i.e.* the final approval hearing, at which class members may be heard regarding the settlement, and at which counsel may introduce evidence and present argument concerning the fairness, adequacy, and reasonableness of the settlement.

First, the Court conducts a preliminary review of the proposed settlement to determine if it "is within the range of possible approval, or in other words, whether there is probable cause to

notify the class of the proposed settlement." *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 855 F. Supp. 825, 827 (E.D. N.C. 1994) (quoting *Armstrong v. Bd. of School Directors*, 616 F.2d 305, 312 (7th Cir. 1980)) (internal quotation marks omitted). Once the Court grants preliminary approval and notice is sent to the class, the Court conducts a fairness hearing to determine if the proposed settlement is "fair, reasonable, and adequate." *Horton*, 855 F. Supp. at 827 (quoting *Armstrong*, 616 F.2d at 314). At the final fairness hearing, the Court considers the factors set forth in *Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975).

**2.   The Standard for Granting Preliminary Approval. This Proposed Settlement is Reasonable, Fair and Adequate Given the Strength of the Case and the Risks of Litigation.**

This motion asks that this Honorable Court take the first step in this three-step process by preliminarily approving the Settlement Agreement of the parties. In *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 U.S. Dist. LEXIS 130288, at *13-15 (D. Md. Sep. 11, 2013), the court explained the standard of review on preliminary approval as follows:

> The preliminary fairness review considers (1) the "fairness" of the settlement, and (2) the "adequacy" of the settlement. *See In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. at 1385. The "fairness" prong is concerned with the procedural propriety of the proposed settlement agreement, while the "adequacy" prong focuses on the agreement's substantive propriety. *In re Am. Capital S'holder Derivative Litig.*, 2013 U.S. Dist. LEXIS 90973, at *9. With regard to the "fairness" element, the purpose of the inquiry is to protect against the danger of counsel — who are commonly repeat players in larger-scale litigation — from "compromising a suit for an inadequate amount for the sake of insuring a fee." *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. at 1383 (quoting *In re Montgomery Cnty. Real Estate Antitrust Litig.*, 83 F.R.D. 305, 315 (D. Md. 1979)). The court thus considers the following factors: whether the proposed settlement is the product of good faith bargaining at arm's length; the posture of the case at settlement; the extent and sufficiency of discovery conducted; counsel's experience with similar litigation and their relevant qualifications; and any pertinent circumstances surrounding the negotiations. *See id.* at 1383-85 (internal citations and quotation marks omitted); *In re Lupron Mktg. & Sales Litig.*, 345 F. Supp. 2d 135, 137 (D. Mass. 2004).

> As to the "adequacy" prong, the court "weigh[s] the likelihood of the plaintiff's recovery on the merits against the amount offered in settlement." *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. at 1384 (quoting *In re Montgomery Cnty. Real Estate Antitrust Litig.*, 83 F.R.D. at 315-16)). Although the court endeavors not to try the case on its own, it remains tasked with carefully assessing the facts and applicable law to ensure that the settlement is proportionate to the strength (and weakness) of the plaintiffs' case. *Id.* The court considers the following factors: "the relative strength of the plaintiffs' case on the merits," *id.* (quoting *In re Montgomery Cnty. Real Estate Antitrust Litig.*, 83 F.R.D. at 315-16); weaknesses in the plaintiffs' case, including proof-related obstacles or particularly strong defenses; the cost of additional litigation; defendants' ability to pay a judgment; and any opposition to the settlement. *See id.*; *In re Lupron Mktg. & Sales Litig.*, 345 F. Supp. 2d at 137-38.

In this case, the proposed settlement easily satisfies each of the above criteria. Courts have held that there is typically an initial presumption that a proposed settlement is fair and reasonable when it is the result of arm's-length negotiations. *Brunson v. La.-Pac. Corp.*, 818 F. Supp. 2d 922, 927 (D.S.C. 2011) ("Given the extended discovery and arm's-length negotiations in reaching this Settlement, the Court finds the presence of good faith and the absence of collusion."); *see also* Newberg on Class Actions §11.41 at 11-88 (3d ed. 1992). Moreover, if the terms of the settlement agreement seem to be fair, courts generally assume that negotiations were proper. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981); *see also* 4 Newberg § 11.41. "The question posed is whether the settlement was achieved through 'arm's length negotiations' by counsel who have 'the experience and ability . . . necessary to effect the representation of the class' interest.'" *S.C. Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1424 (D.S.C. 1990) (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982)).

Regarding the "fairness" criteria enumerated in *In re Titanium*, first, there is no doubt "the proposed settlement is the product of good faith bargaining at arm's length." (Kick Decl. ¶ 6.) In fact, the settlement is the result of a mediator's proposal from Magistrate Judge Copperthite accepted by the two adverse sides, about three weeks after the matter did not settle at the mediation presided over by Judge Copperthite. (Kick Decl. ¶6.)

Second, regarding "the posture of the case at settlement," as stated, the case is being proposed to settle only after an amended complaint was filed on May 5, 2016 (Docket No. 26); a motion to dismiss the First Amended Complaint was filed on May 31, 2016 (Docket No. 33); an Opposition to that Motion to Dismiss was filed on June 17, 2016 (Docket No. 36); and a Reply to that Opposition to Motion to Dismiss was filed on July 5, 2016. (Docket No. 37). (Section II., *supra*.) At all times Defendant denied liability, and continues to deny liability.

Third, regarding discovery, it was robust, including interrogatories, requests for production, a deposition of Defendant's Rule 30(b)(6) witness, and a deposition of the class representative. (Kick Decl. ¶ 5; also, Section II., *supra*.)

Finally, "counsel's experience with similar litigation and their relevant qualifications," is very extensive. (McCune Decl. ¶¶ 2-5; ; Kick Decl. ¶¶ 2-4.) Both firms have litigated and been

appointed class counsel in numerous overdraft fee class actions, and are very experienced not only in consumer class actions, but also in overdraft fee litigation, and believe the settlement is in the best interest of the class. (*Id.*; see also, Section IV.B.4., *infra*.)  The judgment of competent counsel regarding the settlement should be given significant weight. *Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975) ("While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement."); *In re Global Crossing. Sec. & ERISA Litig.*, 225 F.R.D. 436, 461 (S.D.N.Y. 2005); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 493 (N.D. Ill. 2015) (considering, among other factors, "the opinion of experienced counsel").

Therefore, all of the "fairness" criteria are satisfied.

With regard to the "adequacy" criteria from *In Re Titanium* for preliminary approval, they also are satisfied.  As stated, the settlement provides for a monetary fund of $1,700,000, from which all class members will be paid their *pro rata* share, based on the total amount of improper overdraft fees they paid.   Defendants will not receive a reversion of any unclaimed funds.  Based on Mr. Olsen's calculations, Plaintiff's counsel believes that the most likely restitutionary number the class would have received in aggregate, had it prevailed at trial, is $4,573,375. (Kick Decl. ¶ 12.)  Accordingly, the settlement represents approximately 37.17% of that number.  (*Id.*)

Courts in this Circuit have determined that settlements are, of course, reasonable where plaintiffs recover only part of their actual losses.  *See Horton v. Merrill Lynch, Pierce, Fenner & Smith*, 855 F. Supp. 825, 833 (E.D.N.C. 1994) ("[S]everal courts, including the Fourth Circuit, have stated that a settlement that amounted to only a fraction of the potential recovery would not be per se inadequate."); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173-74 (4th Cir. 1975) ("And because the cash settlement may only amount to a fraction of the potential recovery will not per se render the settlement inadequate or unfair.") (internal quotation omitted); *see also In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 U.S. Dist. LEXIS 130288, at *16-17 (D. Md. Sep. 11, 2013) ("Against the uncertainty inherent in proceeding to a verdict, and the cost of a month long trial, the significant dollar value of the Settlements secured by the Class

- 10 -

Plaintiffs militates strongly in favor of a finding that the Proposed Settlement Agreement is proportionate to the strength."); *City of Detroit v. Grinnell Corp.*, 356 F. Supp. 1380, 1386 (S.D.N.Y. 1972) (a recovery of 3.2 % to 3.7 % of the amount sought is "well within the ball park"), aff'd in part, rev'd on other grounds, 495 F.2d 448 (2d Cir. 1974); *Martel v. Valderamma*, 2015 U.S. Dist. LEXIS 49830 * 17 (C.D. Cal. 2015) (approving a settlement of $75,000 when potential damages were $1.2 million, or about 6%); *In re Toys R US FACTA Litig.*, 295 F.R.D. 438, 453 (C.D. Cal. 2014) (approving settlement with *vouchers* (not cash like in this case) potentially worth a maximum of three percent (3%) *if all possible claims were actually made*, or $391.5 million aggregate voucher potential where the class could have recovered $13.05 billion).  In this case, as stated, there will not even be any claims process necessary for class members to receive their money, none of the settlement funds are vouchers, and none of the settlement funds will revert to Defendant.

Although Plaintiff does believe the liability in this case is strong, to continue with the case also would nonetheless be very expensive for both sides.  (Kick Decl. ¶¶ 11-12.)  With regard to expected duration, an otherwise strong case could last for a very substantial time if the proposed settlement were not approved, and be extremely expensive to both sides.  (Kick Decl. ¶¶ 11-12.)  Plaintiff's Counsel believes the likelihood for certification is strong, but there is always some risk in getting consumer class actions certified, even the ones which have the strongest merits for certification.  If the settlement is not approved, Defendant's motion to dismiss will come back on calendar, with an uncertain result.  Next, if Plaintiff defeated that Motion to Dismiss, Plaintiff would file an adverse certification motion, and, if successful, would likely next face a motion for summary judgment.  (Kick Decl. ¶¶ 11-12.)  If Plaintiff defeated that motion, there would be an expensive trial, and regardless of which party prevailed, there likely would be appellate practice, further delaying any possible actual receipt of money by the class members.  (Kick Decl. ¶¶ 11-12.)  The cost of attorneys' fees to both sides from all of this additional activity would be substantial, potentially more than a million dollars in additional attorney time and costs if the matter went all the way to verdict and appeal.  (Kick Decl. ¶¶ 11-12.)

Finally, under the settlement, all class members are treated equally.  All class members for whom an improper overdraft fee has been identified will receive their *pro rata* share based on their "sufficient funds" overdraft fees from the settlement fund. (SA ¶ 7.)    Further, this settlement in substance and structure is more favorable than the vast majority of class action settlements.  The relief is in cash, not coupons.  There will be no claims necessary to be made by class members. And, none of the money will revert to the Defendant.

### 3.     The Proposed Attorneys' Fees and Class Representative Service  Award are Reasonable.

The proposed attorneys' fee award, subject to this Court's approval, under the lodestar method represents approximately a 1.7 multiplier of the lodestar to date. (Kick Decl. ¶ 10.) Under the percentage of benefit method, without consideration for uncollected overdraft fees which will not be pursued by Defendant from the class members, the requested amount equals one-third of the new money being paid by Defendant. Both of these numbers, whether under the lodestar analysis or percentage of benefit analysis, are well within the accepted range for a case as such. *DeWitt v. Darlington Cty.*, Civil Action No. 4:11-cv-00740-RBH, 2013 U.S. Dist. LEXIS 172624, at *41 (D.S.C. Dec. 6, 2013); *Hoffman v. First Student, Inc.*, 2010 U.S. Dist. LEXIS 27329, *11 (awarding one-third of the recovery as attorney's fees in an FLSA action).

In *DeWitt*, the court considered the following factors in approving the award:  "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) this skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases."  2013 U.S. Dist. LEXIS 172624, *29-30.  In the Motion for Final Approval, Class Counsel will address each of these separate factors. Further, Class Counsel also will provide a detailed presentation of the lodestar, and offer to have this

Court review the timesheets should this Court wish to do so.

The proposed class representative service award, $10,000, also is within the range of reasonableness. *Manuel v. Wells Fargo Bank, Nat'l Ass'n*, No. 3:14cv238 (DJN), 2016 U.S. Dist. LEXIS 33708, at *18 (E.D. Va. Mar. 15, 2016) ("the Court finds the $10,000 service award appropriate"); *Helmick v. Columbia Gas Transmission*, No. 2:07-cv-00743, 2010 U.S. Dist. LEXIS 65808, at *9 (S.D. W. Va. July 1, 2010) ("the court approves the $50,000 incentive award to Helmick"); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving service awards of $300,000); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 973 (E.D. Tex. 2000) (approving $25,000 incentive awards to both named plaintiffs). The class representative in this case was very helpful to the case's success, including taking time to sit for an adverse deposition, to prepare in advance for it, and to provide documents, and numerous discussions. (Kick Decl. ¶ 7.)

### 4. The Proposed Forms of Notice and Notice Programs are Appropriate and Also Should Be Approved.

The Settlement Agreement is attached as Exhibit 1 to the Declaration of Taras Kick. The proposed notice is attached as Exhibit 1 to the Settlement Agreement itself. The proposed form of notice and notice program here fully comply with due process and Fed. R. Civ. P. 23. Rule 23(e) of the Federal Rules of Civil Procedure, which pertains to class action settlements, mandates that "notice of the proposed compromise shall be given to all members of the class in such manner as the court directs." Fed. R. Civ. P. 23(e). "The notice must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 657 (1950)). The notice should "describe the action and the plaintiffs' rights in it." *Id.* The notice should be designed "to flush out whatever objections might reasonably be raised to the settlement." *Grice v. PNC Mortg. Corp. of Am.*, Civil Action No. PJM-97-3084, 1998 U.S. Dist. LEXIS 23875, at *22 (D. Md. Apr. 30, 1998) (quoting *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993), *cert. denied,*

*Reilly v. Tucson Elec. Power Co.*, 512 U.S. 1220, 114 S. Ct. 2707, 129 L. Ed. 2d 834 (1994)).

"The Rule also requires that the notice inform potential class members (1) that they have an opportunity to opt out; (2) that the judgment will bind all class members who do not opt out; (3) and that any member who does not opt out may appear through counsel." *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 231 (S.D. W. Va. 2005).   "[T]he interests of absent plaintiffs are sufficiently protected … when those plaintiffs are provided with a request for exclusion that can be returned within a reasonable time to the court." *Id.* (quoting *Philips Petroleum Co.*, 472 U.S. at 814).

The proposed notice meets this standard. (SA Ex. 1.)

**B.      The Proposed Settlement Class Should Be Certified.**

In granting preliminary approval of a proposed settlement, the Court must determine that the proposed settlement class is appropriate for certification. Manual For Complex Litigation § 21.632 (4th ed. 2004); *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997).   Class certification is proper if the proposed class, the proposed class representative, and the proposed class counsel satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a).  Fed. R. Civ. P. 23(a)(1-4).   In addition to meeting the requirements of Rule 23(a), a plaintiff seeking class certification must also meet at least one of the three provisions of Rule 23(b).  Fed. R. Civ. P. 23(b). When a plaintiff seeks class certification under Rule 23(b)(3), the representative must demonstrate that common questions of law or fact predominate over individual issues and that a class action is superior to other methods of adjudicating the claims.  Fed. R. Civ. P. 23(b)(3); *Amchem*, 521 U.S. at 615-16.   Because Plaintiff meets all of the Rule 23(a) and 23(b)(3) prerequisites, certification of the proposed class is proper.

///

**1.      The Requirement of Numerosity is Satisfied.**

The first prerequisite of class certification is numerosity, which requires "the class [be] so numerous that joinder of all members is impractical."  Fed. R. Civ. P. 23(a)(1).  There is no specific number of class members required, though the numerosity requirement is typically

satisfied when the class comprises at least forty members.  *Chisolm v. TranSouth Fin. Corp.*, 184

F.R.D. 556, 560 (E.D. Va. 1999) (citing "An Overview of Federal Class Actions: Past, Present

and Future," Federal Judicial Center Education & Training Series, (2d Ed. 1977) at 22).  In this

case, the number is 33,216.  (Olsen Decl. ¶ 10.)  Numerosity is satisfied.

   **2.**  **The Requirement of Commonality is Satisfied.**

  The second requirement for certification requires that "questions of law or fact common

to the class" exist.  Fed. R. Civ. P. 23(a)(2).  Commonality is demonstrated when the claims of

all class members "depend upon a common contention . . . that is capable of classwide

resolution."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  This requires that the

determination of the common question "will resolve an issue that is central to the validity of each

one of the claims in one stroke."  *Id.*  "Even a single common question will do."  *Dukes*, 131 S.

Ct. at 2556.  In other words, commonality exists where a question of law linking class members

is substantially related to resolution of the litigation even where the individuals may not be

identically situated.  *Morris v. Wachovia Sec., Inc.*, 223 F.R.D. 284, 292 (E.D. Va. 2004)

("Commonality is a liberal standard, and the fact that there are some factual variances in

individual grievances among class members does not defeat commonality."); *Central Wesleyan

College v. W.R. Grace & Co.*, 143 F.R.D. 628, 636 (D.S.C. 1992), *aff'd* 6 F.3d 177 (4th Cir.

1993) (stating that commonality "does not require that all, or even most, issues be common, nor

that common issues predominate, but only that common issues exist.").

  Here, not only do there exist common questions of law and fact, the common questions

predominate over any individual ones.  The theories underlying the class claims involve a

uniform overdraft fee practice and uniform contractual terms.  It is undisputed that Defendant

uniformly and systematically used what it calls the "available balance" to determine whether to

assess an overdraft fee on a transaction, as opposed to utilizing the actual money in the account

to make this determination. Therefore, answering whether Defendant breached its contract terms

in doing that will by definition predominate for all class members. Additionally, it is also

undisputed that the operative terms regarding the overdraft fee program, and specifically the

balance calculation to be used to determine the assessment of overdraft fees, as set forth in the

Opt-In Contract (e.g. enough money in the account to cover a transaction) were provided to all class members.  (First Amended Complaint at ¶¶ 23-24.)

As such, the commonality requirement is satisfied.

### 3.     The Requirement of Typicality is Satisfied.

Rule 23 next requires that the class representative's claims be typical of those of the class members.  Fed. R. Civ. P. 23(a)(3).  "The 'typicality' requirement focuses on the consideration of whether the representative's interests are truly aligned and consistent with those of the class members." *Smith v. B & O R.R. Co.*, 473 F. Supp. 572, 581 (D. Md. 1979).  "Factual differences will not necessarily render a claim atypical if the representative's claim arises from the same event, practice or course of conduct that gives rise to the claims of the class, and is based on the same legal theory." *Id.*  "For example, it has been held that the typicality requirement may be satisfied even though varying fact patterns support the claims or defenses of individual class members, *see, e.g., Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974), and even though there is a disparity between the damages claimed by the representative and those claimed by the other members of the class." *Id.*

Plaintiff's claims are not only typical of those of the other putative class members, they are virtually indistinguishable.  There is no dispute that Plaintiff entered into the uniform and standardized Opt-In Contract and that she was assessed overdraft fees when there was enough money in the account (i.e., the ledger balance) to complete the requested transaction.

Therefore, typicality is satisfied.

### 4.     The Requirement of Adequate Representation is Satisfied.

The final Rule 23(a) prerequisite requires that the proposed class representative has and will continue to "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

As stated in this district:

The "fairness and adequacy of representation" requirement of 23(a)(4) goes to the legal capacity of the plaintiff's counsel to represent the class as well as to the ability of the representative himself to pursue a course of conduct beneficial to the absent class members. In determining whether an aspiring representative or, as in this case, a group of representatives meets this standard, courts have found several factors to be significant. First, most courts have found that the representative must have interests sufficiently

identical to those of the absent class members so that he will vigorously prosecute the suit on their behalf. *See* 1 H. Newberg, Supra, § 1120. Further, some courts have stated that the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation. *See, e.g., Amos v. Board of Directors of Milwaukee*, 408 F. Supp. 765, 774-75 (E.D.Wis.), *aff'd*, 539 F.2d 625 (7th Cir. 1976); 7 Wright & Miller, Supra, § 1766. Finally, some courts have required a showing that the representatives have interests which are not antagonistic or in conflict with the objective of those he purports to represent. *See, e.g., Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1973); *Feliciano v. Romney*, 363 F. Supp. 656 (S.D.N.Y.1973).

*Smith v. B & O R.R. Co.*, 473 F. Supp. 572, 581 (D. Md. 1979).

As with the typicality requirement, adequacy requires that the interests of the named plaintiffs be aligned with the unnamed class members to ensure that the class representative has an incentive to pursue and protect the claims of the absent class members. *See Amchem*, 521 U.S. at 626 n. 20, 117 S.Ct. 2231 ("The adequacy-of-representation requirement 'tends to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'")

Proposed Class Counsel, Richard McCune of McCune Wright Arevalo, LLP, and Taras Kick of The Kick Law Firm, APC, both have significant class action, litigation, and trial experience, are competent, and have been competent in representing the class. (McCune Decl. at ¶¶ 2-5; Kick Decl. at ¶¶ 2-4.) Both law firms representing the putative class have extensive experience in consumer class actions, and in particular, expertise in overdraft fee litigation. (McCune Decl. at ¶¶ 2-5; Kick Decl. at ¶¶ 2-4.) The interests of Plaintiff Mary Ketner are not antagonistic to those of the other Class members; her interests are wholly aligned because she was charged overdraft fees when her account had a positive ledger balance. Further, she understands that she is pursuing this case on behalf of all class members similarly situated and understands she has a duty to protect the absent Class members. (Ketner Decl. ¶ 2-3; Kick Decl. ¶ 7.) She has actively participated in the litigation by frequently conferring with class counsel about the case and its status, assisting class counsel by gathering documents and other information, testifying at deposition, and being prepared and willing to testify at trial on behalf of the class if necessary. (Ketner Decl. ¶ 2-3; Kick Decl. at ¶ 7.)

**5.      Ascertainability is Satisfied.**

The Fourth Circuit has "recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable,'" which has been described as an "'ascertainability' requirement." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014).  Under this requirement, "[a] class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.*  Here, the class is clearly ascertainable, as its exact constituency already has been ascertained. (Olsen Dec.  ¶ 10.)

**6.      The Proposed Settlement Class Meets the Requirements of Rule 23(b)(3).**

Once the prerequisites of Rule 23(a) have been met, a plaintiff must also demonstrate that she satisfies the requirements of Rule 23(b). *Id.*  To certify a class under Rule 23(b)(3), the plaintiff must show that (1) the common questions of law and fact predominate over questions affecting only individuals and (2) the class action mechanism is superior to other available methods for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

**a.      Common Questions of Law and Fact Predominate.**

The predominance requirement questions whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  "Where the damages are capable of mathematical or formula computation, the class action comes rather close to an ideal one and there is certainly no question of the lack of 'predominance' of the common questions." *Windham v. American Brands, Inc.*, 565 F.2d 59, 68 n.22 (4th Cir. 1977) (quoting Practicing Law Institute, Current Problems In Federal Civil Practice at 491 (1975)). "Critically, Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 273 (4th Cir. 2010) (citing *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 429 (4th Cir. 2003); *see also Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) (denying class certification was improper where the primary issue was the value of an offer to the consumer in aggregate, *i.e.*, a normal customer, and thus did not require individualized analysis); *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) ("The individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3). Where . . . common questions predominate regarding

- 18 -

liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.") . . . *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) ("Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.") (internal quotation marks and alteration marks omitted).

> As the Supreme Court most recently explained:
>
> When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016).  Both the contract claims and violation of Regulation E claims are subject to common proof, and thus it would be more efficient to decide those common issues via the class action mechanism.

The primary issues on liability in this case are class-wide.  As SECU does not dispute its practice of charging fees based on the available balance while the ledger balance contains enough money to pay for the transaction, the issue is whether the contract permitted it to do so. Further, under Maryland law, the determination of the parties' intent in entering a contract is a question of objective intent.  *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620, 630 (2001) ("Under the objective interpretation principle, where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court.").  For this reason, among others, courts in this circuit have granted class certification for classes alleging breach of a common contract.  *James Foster & Stone Logistics, Inc. v. CEVA Freight, LLC*, 272 F.R.D. 171, 176 (W.D.N.C. 2011) ("Plaintiffs maintain that if CEVA has breached certain provisions of the operating agreement by failing to comply with the federal regulations, it has breached those provisions in an identical manner for all class members.")

The common questions for claims for violation of Regulation E also predominate over any individualized issues.  The Opt-In contract states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." (FAC, Ex. 2.) The central liability question—whether the above language describes "in a clear and readily

understandable way" SECU's actual overdraft service -- predominates over any individualized questions.

**b.** **This Class Action is the Superior Method of Adjudication.**

Rule 23(b)(3) also requires that a certifying court find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 213 (E.D. Va. 2003) ("The superiority inquiry tests whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.")  "The rule requires the court to find that the objectives of the class-action procedure really will be achieved in the particular case. In determining whether the answer to this inquiry is to be affirmative, the court initially must consider what other procedures, if any, exist for disposing of the dispute before it." *Stillmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010) (quoting 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1779 (3d ed. 2005)).

As the Supreme Court stressed in *Amchem*, 521 U.S. at 617:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

As Judge Posner has stated, "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).  Here, under Judge Posner's formulation, there is no feasible alternative to a class action, as the amount in each instance is at most an overdraft fee, something over which, as Judge Posner stated, only a fanatic or lunatic would pursue litigation in a non-class action context.  There is no question that a large number of class members have suffered damages in an amount that could not justify or sustain individual lawsuits, and the only choice is between a class action and no action.  Plaintiff is not aware of any additional suits instituted by or against the class members concerning the subject matter of the settlement.  Superiority is met.

Accordingly, all factors weigh in favor of class certification.

## C.    SCHEDULE OF SETTLEMENT DATES.

The next steps in the settlement approval process are to notify the Class of the proposed Settlement, allow an opportunity for opt-outs and objections, and to hold a fairness hearing. Plaintiff proposes the following dates, if such dates are acceptable to this Honorable Court:

| | |
|---|---|
| **Claims Administrator Sends Notice and Website Goes Live** | **Ten Days After Preliminary Approval** |
| **Last day to Opt Out** | **Thirty Days After Claims Administrator Sends Notice** |
| **Motion for Final Approval and Attorneys' Fees Filed with Court** | **Thirty-Five Days After Claims Administrator Sends Notice** |
| **Last day to Object** | **Fifteen Days After Motion For Final Approval and Attorneys' Fees is Filed With the Court** |
| **Last day to file responses to objections and Class Counsel's and Defendants' Replies in Support of Motion for Final Approval and Attorneys' Fees** | **Ten Days After Last Day to Object** |
| **Final Approval Hearing** | **Twenty Days After Last Day to Object** |
| **Filing by Claims Administrator of Final Report** | **Thirty Days After Time to Cash Checks has Expired** |

## V.    Conclusion.

Based on the foregoing, Plaintiff respectfully requests that the Court:  (1) preliminarily approve the Settlement; (2) approve the proposed plan of notice to the Class; (3) appoint the lower bidder of Kurtzman Carson Consulting or Garden City Group as the Notice Administrator, of which Class Counsel will inform the Court prior to the hearing; (4) set a schedule of dates as set forth above for further action on this Settlement Agreement, including a hearing pursuant to Rule 23(e) of the Federal Rules of Civil Procedure to determine whether the proposed Settlement is fair, reasonable, and adequate and should be finally approved.

Dated: September 18, 2017    Respectfully submitted,

           JANET, JENNER & SUGGS, LLC
           MCCUNE • WRIGHT • AREVALO LLP
           The Kick Law Firm, APC


           /s/ Taras Kick
           Taras Kick, *Pro Hac Vice*
           Taras@kicklawfirm.com
           Robert Dart, CA State Bar #264060*

Robert@kicklawfirm.com
**THE KICK LAW FIRM, APC**
201 Wilshire Boulevard
Santa Monica, California 90401
Telephone:   (310) 395-2988
Facsimile: (310) 395-2088

Richard D. McCune, *Pro Hac Vice*
rdm@mccunewright.com
Jae (Eddie) K. Kim, CA State Bar #236805*
jkk@mccunewright.com
**McCune • Wright • Arevalo llp**
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone:  (909) 557-1250
Facsimile:  (909) 557-1275

Robert K. Jenner, Esquire (Bar No. 04165)
Lindsey M. Craig, Esquire (Bar No. 29522)
Adam P. Janet, Esquire (Bar No. 11222)
**Janet, Jenner & Suggs, LLC**
1777 Reisterstown Road, Suite 165
Baltimore, Maryland 21208
Telephone: (410) 653-3200
Facsimile: (410) 653-6903
RJenner@MyAdvocates.com
LCraig@MyAdvocates.com
AJanet@MyAdvocates.com
*Counsel for Plaintiff Mary Ketner*
*and the Putative Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2017, a copy of the foregoing document was electronically filed using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

Respectfully submitted,

/s/ Robert Dart_____